UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81032-CIV-MATTHEWMAN

EVETTA TAULBEE,

     Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security
Administration,

     Defendant.

_____/



FILED by _____ D.C.

**JUL 1 4 2017**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## **ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 35, 36]**

     THIS CAUSE is before the Court upon Plaintiff, Evetta Taulbee's ("Plaintiff") Statement of Material Facts and Memorandum in Support of Complaint [DE 35][1], and Defendant, Nancy's A. Berryhill, Acting Commissioner of Social Security Administration's ("Defendant") Motion for Summary Judgment [DE 36].   The parties have consented to magistrate judge jurisdiction.   [DE 32].   The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff and whether the correct legal standards have been applied.   *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] The Court will treat this filing as a motion for summary judgment.

## I. FACTS

On November 28, 2011, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, asserting a disability on-set date of September 28, 2011.  [R. 19].[2] The claim was denied initially and upon reconsideration.  *Id.*  Following a hearing on October 15, 2014, the ALJ issued a decision on January 30, 2015, denying Plaintiff's request for benefits. [R. 19-30].  A request for review was filed with the Appeals Council and denied on April 14, 2016.  [R. 1-6].

### A.   Hearing Testimony

The ALJ held a hearing on October 15, 2014.  [R. 35].  Plaintiff testified that she was 51 years old on the date of the hearing.  [R. 37].  She lives with her husband and does not care for any minor children.  [R. 40].  Plaintiff does not drive because her Percocet makes her very tired and blurs her vision.  *Id.*  She last worked in 2011 as a nurse at a hospital, but she had to stop working because she could no longer walk the halls or take care of her patients.  [R. 41]. Plaintiff was put on probation for often leaving early and "calling off" due to her pain.  *Id.*  Her RN license was valid and active through 2015.  [R. 42].

Plaintiff explained that she cannot vacuum, mop, or sweep, but that she can cook very simple meals.  [R. 43].  Plaintiff does not have friends or use a computer in her daily life.  *Id.* She does participate in social media on a limited basis.  *Id.*  Plaintiff travels once a year by airplane, but traveling makes her tired.  [R. 44].  She watches two to three hours of television a day from her recliner.  [R. 45].  Plaintiff tries to read books but has trouble concentrating and looking down due to her neck pain.  *Id.*  She used to enjoy gardening and going to the beach, but she cannot really participate in those activities anymore.  [R. 46].  She tries to sit outside for at

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 31.

least an hour a day. *Id.*

Plaintiff testified that, while she is not aware of any trauma to her back, she had a ruptured disc and a laminectomy in 2012. [R. 41-42]. She also has a degenerative disc in her neck, but she has no plans to have surgery on it. [R. 45]. Plaintiff also has bilateral carpal tunnel. [R. 48]. She has already had surgery on both arms and does not want to receive the release surgery recommended to her over two years prior to the hearing until her pain is under control. [R. 48-49].

Plaintiff smokes a half a pack of cigarettes per day and is trying to quit. [R. 46]. She has medical insurance. *Id.* Plaintiff takes the following medications daily: Percocet, ibuprofen, Xanax, Cymbalta for depression, and Zetia for high cholesterol. [R. 47-48]. Certain medications that Plaintiff has taken in the past have exacerbated her pain. [R. 48].

Plaintiff stated that her mood is not stable on her medication. [R. 49]. She is very depressed and sluggish, has to ask her husband to repeat things, and has issues with her concentration and following directions. *Id.* Plaintiff does not have a formal pain management doctor because a past doctor wanted to implant a TENS unit in her spine, which she did not want, and because pain management doctors are more expensive to go to. [R. 50-51]. Plaintiff's primary care doctor, Dr. Thomas, manages her pain with medication. *Id.*

Plaintiff is not seeing a psychiatrist because she is looking for one that accepts her insurance. [R. 52]. She did not like her prior psychiatrist. *Id.* Plaintiff still sees things that are not there and hears voices and music. *Id.* She was diagnosed with depression at age 30, but it was managed with medication while she was working. *Id.* Plaintiff is more depressed now, so the medications no longer work. [R. 53]. She has had no inpatient psychiatric hospitalizations. *Id.* Plaintiff did see a therapist, but she no longer sees the therapist because therapy did not help

3

her.  *Id.*  She had no emergency room visits in the six months prior to the hearing and no hospitalizations for the year prior to the hearing.  *Id.*

Plaintiff experiences a lot of pain throughout her body.  [R. 54].  Sitting for more than 15 to 20 minutes causes her lower back and hip pain, and then her legs start to go numb.  [R. 54, 56]. Plaintiff was "pretty uncomfortable" sitting at the hearing.  [R. 56].  She uses a cane to walk and cannot walk for more than a half hour per day.  [R. 54].  Plaintiff has carpal tunnel in both arms, so she cannot do computer work.  *Id.*  Both of Plaintiff's hands are numb, she can only write a few lines at a time, and she cannot type.  [R. 55].  Plaintiff's right hand also shakes, and her left hand occasionally shakes as well.  *Id.*  She has problems gripping or holding onto things.  [R. 56].  She has trouble sleeping and has to nap during the day.  [R. 54].  Sleep medications have had too many side effects for Plaintiff in the past.  [R. 55].  Plaintiff cannot lift and pour a full container of orange juice without her husband's help.  [R. 56-57].

Plaintiff has gained 20 pounds since she stopped working.  [R. 57].  The extra weight causes Plaintiff's knees to give out.  *Id.*  Plaintiff has trouble driving because she has a limited range of motion of her neck.  *Id.*  While Plaintiff did bring a cane to the hearing, it was not prescribed.  [R. 59].  Her doctor did tell her she should probably use the cane since she had been falling.  *Id.*

Plaintiff does not like getting surgeries because they have caused so many problems in the past.  [R. 60].  Her carpal tunnel surgery in 2007 did not resolve her problem with her hands.  *Id.* The problem has actually gotten worse.  [R. 61].  Plaintiff's 2012 back surgery made her condition worse.  *Id.*  Her greatest pain is in her neck, shoulders, arms, and lower back.  [R. 62]. Sharp pain also radiates into her legs if she walks too far.  *Id.*  Plaintiff cannot reach up and grab anything due to her shoulder pain, and her wrist gives out as well.  [R. 63].  She can reach and

4

grab in front of her.  *Id.*   Plaintiff's depression is severe, and she wants to sleep all the time.  [R. 63-64].   She has trouble with her short-term memory.  [R. 64].

Donna Taylor, the vocational expert, testified at the hearing.  [R. 67].  The ALJ first posed a hypothetical in which an individual of the same age, education, and work experience as Plaintiff had the following limitations: only light work with the ability to occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to 10 pounds; no sitting limitations; standing and walking limited to six hours in an eight-hour workday; occasional postural functions of climbing ramps or stairs, kneeling, and stooping; no crawling and no climbing of ladders, ropes, or scaffolds; no constant fine bilateral manipulation, but frequent and occasional remain intact; no overhead lifting, no overhead carrying, and no overhead reaching with the bilateral upper extremities; and capacity to remember, understand, and carry out at least SVP 5 instructions and perform at least SVP 5 jobs as consistent with the lowest end of skilled work.  [R. 68-69].  The vocational expert explained that such an individual would be able to perform her past work as a home health coordinator only.  [R. 70].

The ALJ then added to the hypothetical that the individual should be allowed the opportunity to alternate between sitting and standing, but that this would not cause the individual to be off-task.  [R. 70].  The vocational expert stated that, for the home health coordinator and all jobs that permit alternating sitting and standing positions, it would only be disruptive if the Plaintiff could not sit for at least a half hour at a time.  *Id.*

For the third hypothetical, the ALJ combined the first and second hypotheticals and then dropped the SVP level to 3 to 4.  [R. 71].  She then asked if there are any transferable skills from the past work that would transfer to other light SVP 3 to 4 jobs.  *Id.*  The vocational expert responded that the transferable skills from past work would transfer to the jobs of companion,

receptionist, dispatcher, hospital admitting clerk, office helper, and order caller.  [R. 71-73].  The expert also explained that the only job that fits all of the criteria, is sedentary, requires occasional fine manipulation, and is at the unskilled level would be surveillance system monitor.  [R. 73].

For the fourth hypothetical, the ALJ reduced standing and walking to four hours out of an eight-hour day.  [R. 73-74].  The vocational expert testified that the home health aide job would be eliminated, but that the jobs of companion, receptionist, dispatcher, and admit clerk would allow for reduced standing and walking.  [R. 74].  For the fifth hypothetical, the ALJ reduced standing and walking to two hours out of an eight-hour day, and the expert stated that the same jobs would remain.  *Id.*  For the sixth hypothetical, the ALJ stated that the individual would be off task physically for one-third of an eight-hour workday, and the expert stated that no jobs would allow for this.  *Id.*  Finally, for the seventh hypothetical, the ALJ asked if the individual could be a home health coordinator if she had to use a cane when walking to and from a work station.  *Id.*  The expert stated that the individual could not be a home health coordinator, but could work at all of the other jobs listed earlier.  [R. 75].

Plaintiff's counsel asked the vocational expert whether changing the ALJ's first hypothetical by reducing bilateral fine manipulation to occasional would impact the individual's ability to work at past jobs.  [R. 76].  The expert responded that the individual could still work as a nurse, but not as a home health coordinator.  *Id.*  Plaintiff's counsel also asked, if the ALJ's hypothetical was limited to occasional overhead reaching, whether it would preclude the companion job.  [R. 81].  The expert stated that it would.  *Id.*  Plaintiff's counsel asked how missing three to five days of work per month would affect an individual's job, and the expert stated that such an individual would not be employable.  [R. 82].  Next, Plaintiff's counsel changed the ALJ's hypothetical to add the limitation that the individual has little range of motion in her neck.

*Id.* The expert explained that such an individual would not be able to do clerical work, but she could do the other jobs, although she would be fatigued. *Id.*

B.   Medical Record Evidence

In reaching her decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

From October 10, 2010, to October 24, 2011, Plaintiff saw Dr. Andrew Belis for foot-related pain. [R. 288-307]. On October 10, 2010, Dr. Belis noted that the injection to Plaintiff's right heel spur had had good results and that Plaintiff's right foot tarsal tunnel syndrome, contracture of joint of ankle and foot, pain in joint involving ankle and foot, Achilles tendonitis, calcaneal spur, contracture of plantar fascia, and neuralgia nos were all improving. [R. 307]. On January 17, 2011 and January 31, 2011, Dr. Belis performed arthrocentesis of a heel spur and strapping of Plaintiff's right foot for her plantar fasciitis. [R. 297-30; 303-304].

On August 30, 2011, Plaintiff went to the emergency room with flank pain. [R. 272]. She was diagnosed with pyelonephritis and was treated with medication. [R. 272-73]. Plaintiff had a chest x-ray performed and was determined to have some subsegmental atelectasis in the right lung base with no active infiltrate. [R. 257]. She also had a renal CT scan. [R. 260]. A doctor determined that Plaintiff had a probable cyst in the left kidney. *Id.*

On September 16, 2011, Plaintiff saw Dr. Jerry Thomas for an emergency room follow-up. [R. 253]. She complained that she was depressed, that the depression had been gradual, and that it had been occurring in a persistent pattern for years. *Id.* She stated that she felt blue, sad, and tired, and that the depression had been increasing. *Id.* Plaintiff also complained of elbow pain and nephrolithiasis. *Id.* The physical exam was normal. [R. 253-54]. Dr. Thomas increased Plaintiff's depression medication and put her on medication for her bursitis. [R. 254].

7

On September 27, 2011, Dr. Belis noted that Plaintiff's right foot contracture of joint of ankle and foot, pain in joint involving ankle and foot, and Achilles tendonitis were all worsening, but that her calcaneal spur was improving. [R. 296]. He performed strapping/Unna boot and noted that Plaintiff's work status was limited to sedentary duty. *Id.*

On October 4, 2011, Dr. Belis noted that Plaintiff's MRI had shown no Achilles tear, but had shown plantar fasciitis, a dorsal nav spur, and thinning of the ankle cartilage. [R. 292]. He also noted that Plaintiff's right foot contracture of joint of ankle and foot, pain in joint involving ankle and foot, and Achilles tendonitis were all worsening, but that her calcaneal spur was improving. [R. 293]. He reported that Plaintiff had venous embolism and thrombosis of deep vessels of her right distal lower extremity. *Id.* Dr. Belis had Plaintiff continue to take pain medication and use a fracture walker. *Id.*

An October 6, 2011 MRI of Plaintiff's right tibia and fibula showed no abnormal morphology or signal of the Achilles aponeurosis. [R. 338]. The MRI showed minimal edema in the proximal aspect of Kager's fat deep to the Achilles tendon 5 cm proximal to its insertion. *Id.*

On October 24, 2011, Dr. Belis noted that Plaintiff's right foot contracture of joint of ankle and foot, pain in joint involving ankle and foot, and Achilles tendonitis were all worsening, but that her calcaneal spur was improving. [R. 291]. He recommended that Plaintiff be limited to light duty at work. *Id.*

On October 27, 2011, Plaintiff presented to Dr. Andrew Gross for pain management of her lumbar and neck pain. [R. 284]. He noted that Plaintiff had a normal gait and ambulated without a limp. [R. 286]. Dr. Gross also noted that imaging of Plaintiff's cervical and lumbar spines showed mild degenerative disc disease and osteoarthritis of the cervical spine and minimal

degenerative disc disease of the lumbar spine. *Id.* Dr. Gross diagnosed Plaintiff with carpal tunnel syndrome, causalgia, sacroiliitis, lumbosacral spondylosis without myelopathy, neck pain, and low back pain. [R. 287]. He recommended injections, medication, and physical therapy. *Id.* An October 31, 2011 MRI of Plaintiff's lumbar spine showed foraminal and lateral annular bulge on the right side at L4-5 with partial effacement of the perineural fat around the exiting right L4 nerve root. [R. 337].

On November 15, 2011, Dr. Gross noted that medications only partially relieved Plaintiff's pain. [R. 280]. He explained that Plaintiff was not to return to full duty work on an indefinite basis. [R. 282]. On December 19, 2011, Plaintiff again saw Dr. Gross for her back pain. [R. 276]. He explained that epidural injections had either given no relief or made Plaintiff's pain worse, and he gave her an additional injection. [R. 276-78]. Dr. Belis also sent Plaintiff for a surgical evaluation. [R. 278].

On January 5, 2012, Plaintiff saw Dr. John Sarzier for a neurosurgical consultation. [R. 310]. Dr. Sarzier diagnosed Plaintiff with lumbar spinal stenosis and noted that Plaintiff had exhausted conservative therapy. [R. 313]. He offered Plaintiff surgical intervention, and she stated that she wished to proceed to surgery. *Id.* On January 11, 2012, Plaintiff had a right-sided L4-5 foraminotomy (far lateral hemilaminotomy, medial facetectomy, and far lateral discectomy). [R. 264].

Plaintiff had an echocardiogram performed on January 12, 2012. [R. 258]. It was determined that her estimated left ventricular ejection fraction was 55-60%, her right ventricular chamber size and systolic function were with normal limits, and physiologic mitral and bicuspid valve regurgitation could be observed. *Id.* Plaintiff was diagnosed with intraoperative bradycardia. [R. 271].

On January 26, 2012, Plaintiff saw Dr. Sarzier for a postoperative visit.   [R. 360]. Plaintiff stated that she had worsening pain, but in different areas—into the right groin and right hip region.  *Id.*  She stated that the pain extended down the posterior aspect of the leg all the way down to the ankle.  *Id.*  Plaintiff explained that she had to use a cane to walk for fear that she would fall secondary to the weakness in her leg.  *Id.*  She stated that Percocet and Valium only helped with the pain to an extent and that the medications made her tired.  *Id.*

On January 31, 2012, Plaintiff had an MRI of her lumbar spine.  [R. 334].  It was determined that she had operative changes at the right facet joint at L4-5 with enhancement of the right foramen and around the L5 nerve root with interval development of enhancement of this right S1 nerve root.  *Id.*  She was not found to have recurrent disc herniation.  *Id.*

Plaintiff saw Dr. Sarzier on February 9, 2012.  [R. 373].  She stated that she continued to have right hip and groin pain that traveled to her right knee, calf, and the top of her right foot.  *Id.* Dr. Sarzier noted that Plaintiff ambulated without the use of an assistive device and prescribed her antibiotics and Arthrotec to avoid her body rejecting the sutures.  *Id.*  Plaintiff next saw Dr. Sarzier on February 28, 2012.  [R. 358].  She continued to complain of pain primarily in the right buttocks and into the lateral aspect of her thigh.  *Id.*  She claimed to have no improvement from the surgery and reported some occasional tinging on the back part of her calf.  *Id.*  Plaintiff stated that Percocet and Valium helped to dull the pain.  *Id.*  The doctor recommended physical therapy.  *Id.*  On March 1, 2012, Plaintiff saw Dr. Sarzier and complained of pain in her right buttocks that went into the lateral aspect of her thigh.  [R. 372].  She claimed to have no improvement since the surgery and described occasional tingling in the back part of her calf.  *Id.*

In the March 23, 2012, Disability Determination Explanation at the initial level, the medical consultant found that Plaintiff could perform skilled, sedentary work and was not

10

disabled.  [R. 94-95].  In the June 25, 2012, Disability Determination Explanation at the reconsideration level, the medical consultant found that Plaintiff could stand and/or walk for a total of four hours in an eight-hour workday, could perform skilled, sedentary work, and was not disabled.  [R. 104-107].

Plaintiff saw Dr. Thomas on March 29, 2012, for her depression.  [R. 463].  She described feeling blue and sad, feeling tired, being unable to concentrate, being anxious and indifferent, having a change in appetite, having episodes of spontaneous crying, having difficulty sleeping, and an inability to take pleasure in her former interests.  *Id.*  Plaintiff did not have anxiety or suicidal ideation.  *Id.*  Dr. Thomas prescribed medication.  *Id.*

Plaintiff saw Dr. Sarzier on April 3, 2012.  [R. 371].  She reported that physical therapy had not helped, that the surgery may have made her pain worse, and that she experienced stiffness in her lower back, achiness in her hips, an inability to move, achiness across the base of her spine, and a recurrence of her carpal tunnel bilaterally.  *Id.*  Dr. Sarzier explained that Plaintiff's postoperative imaging of her spine and hip did not show significant pathology that would explain Plaintiff's complaints.  *Id.*  Dr. Sarzier referred Plaintiff to a psychiatrist.  *Id.*  He also discontinued Plaintiff's Valium and gave her the last prescription of Percocet he was willing to prescribe.  *Id.*

On May 1, 2012, Plaintiff saw Dr. Robert Mehrberg for a psychiatric consultation.  [R. 368].  Dr. Mehrberg noted that Plaintiff was on Celexa for her depression.  *Id.*  He opined that Plaintiff suffers from a chronic pain syndrome, likely fibromyalgia.  [R. 370].  He noted that Plaintiff's widespread pain inventory was a 15, and her symptoms severity score was a 9.  *Id.*

On June 7, 2012, Plaintiff saw Dr. Jack Clark for a rheumatology consult.  [R. 379].  He diagnosed her with fibromyalgia and prescribed medication.  [R. 380].  Plaintiff saw Dr. Clark

11

again on August 21, 2012.  [R. 383].  Plaintiff continued to complain of pain, and the doctor changed her medications.  [R. 384].

Plaintiff saw Dr. Thomas on September 5, 2012, for a follow up regarding her fibromyalgia, anxiety, and high lipids.  [R. 461].  Plaintiff complained of significant neck and low back pain and anxiety.  *Id.*  Dr. Thomas altered Plaintiff's medications.  [R. 462].  Plaintiff visited Dr. Thomas again on September 19, 2012, because her medications had not controlled her pain.  [R. 458].  Dr. Thomas noted that Plaintiff's anxiety was controlled with medication and prescribed medication for Plaintiff's hyperlipidemia and fibromyalgia.  [R. 459].

On October 17, 2012, Plaintiff had a consult with Dr. Adam Shuster regarding her chronic pain, which had worsened over the last six months.  [R. 388].  Plaintiff explained that nothing in particular caused her pain, and she described the pain as aching, burning, constant, deep, sharp, shooting, sore, stabbing, tender, and throbbing.  *Id.*  She stated that her pain was made worse with anxiety, bending, twisting, standing, walking, coughing, cold temperatures, sneezing, and sitting.  *Id.*  Plaintiff explained that the pain was a 9 when she woke up and that the pain interfered with her sleep and daily activities.  *Id.*  Dr. Shuster found that Plaintiff scored a 36 on the Beck depression inventory, which is significant for depression, though Plaintiff had no suicidal ideation.  [R. 390].  Dr. Shuster prescribed Plaintiff additional medication and told her to continue taking Cymbalta.  [R. 391].  He also recommended that Plaintiff see a psychologist for possible cognitive behavioral therapy to help with her fibromyalgia.  [R. 401].

Plaintiff saw Dr. Shuster again on November 20, 2012.  [R. 401].  Plaintiff reported a pain level of 10 and pain in her lumbar area, bilateral lower extremities, cervical area, and bilateral upper extremities from the elbow down.  *Id.*  She stated that the pain became worse the prior week and radiated down into her feet bilaterally and posteriorly.  *Id.*  Plaintiff also reported pain

in the vaginal area and groin area bilaterally. [R. 402]. She stated that she was taking more hydrocodone than had been prescribed. *Id.* Dr. Shuster noted that Plaintiff was using a cane to walk. *Id.* He increased Plaintiff's hydrocodone until she could come in for injection therapy. *Id.*

Plaintiff saw Dr. Shuster on January 3, 2013. [R. 412]. Plaintiff complained of pain in her left shoulder and posterior shoulders bilaterally, her arms distal to the elbows bilaterally, her low back, her buttock, and her left knee radiating to the back of her legs. [R. 413]. She stated that the pain was an 8. *Id.* Dr. Shuster adjusted Plaintiff's medications and performed a transforaminal epidural steroid injection at the L5-S1 level on the right side. *Id.* Dr. Shuster saw Plaintiff on January 31, 2013, for a follow-up. [R. 424]. Plaintiff said that her pain was an 8 and that she had pain in her posterior shoulders and low back and buttock radiating down the back of her legs. [R. 424-25]. She told the doctor that the epidural gave her initial relief but wore off. [R. 425]. Dr. Shuster performed a caudal epidural steroid injection under fluoroscopic guidance. *Id.*

Plaintiff saw Dr. Shuster on March 6, 2013, for a follow-up. [R. 435]. She reported her pain as a 9 and said that she experienced pain in her lumbar area with bilateral lower extremity radiculopathy, as well as radiculopathy into the groin bilaterally, thoracic area, and cervical area. *Id.* Plaintiff stated that the caudal epidural provided about two weeks' relief at about 50%. *Id.* Plaintiff stated that she did not want any further injection therapy. *Id.* Dr. Shuster told Plaintiff to continue on her hydrocodone, Zanaflex, and gabapentin. [R. 436].

Plaintiff saw Dr. Shuster on May 2, 2013. [R. 444]. She rated her pain as a 9 and said the pain was in the lumbar area with bilateral lower extremity radiculopathy. *Id.* Plaintiff stated that her hydrocodone did not seem strong enough, but her Zanaflex worked at night. *Id.* Plaintiff

was unwilling to try a spinal cord stimulator.  [R. 445].  Dr. Shuster prescribed Plaintiff hydrocodone and suggested she find another doctor.  *Id.*

Plaintiff saw Dr. Thomas on May 8, 2013, complaining of severe fibromyalgia, spasms in the right lumbar paraspinal region, dull aching back pain, and pain radiating to the right and left legs.  [R. 456].  Dr. Thomas noted Plaintiff's normal gait and normal muscle strength, as well as her decreased range of motion and paraspinous muscle spasms.  *Id.*  Dr. Thomas completed a trigger point injection and changed Plaintiff's pain medications.  [R. 457].

Plaintiff saw Dr. Thomas on June 13, 2013, for a follow up.  [R. 454].  Dr. Thomas continued Plaintiff on the same medications for her pain and anxiety.  [R. 455].  Plaintiff saw Dr. Thomas again on August 18, 2013, for an annual visit.  [R. 480]. He changed some medications and continued others, and he noted that Plaintiff's anxiety and depression were controlled by medication.  *Id.*  Plaintiff saw Dr. Thomas on November 19, 2013, for a pain medication prescription.  [R. 478].  Plaintiff saw Dr. Thomas on February 21, 2014, and he noted that her depression and anxiety were controlled by medication.  [R. 475-76].  He continued her pain medication.  [R. 476].

On March 27, 2014, Plaintiff had imaging of her hips and pelvis completed.  [R. 491].  It was determined that she had no fractures or dislocations of the hips bilaterally, as well as no pelvic fractures, osteolytic or osteoblastic bony lesions.  *Id.*  On the same date, she had imaging of her lumbar spine and cervical spines completed.  [R. 489-90].  It was determined that Plaintiff had no fracture or spondylosisthesis of the lumbar spine or the cervical spine, but had degenerative spondylosis of the cervical spine most significant at the C5-6 level.  *Id.*

Plaintiff saw Dr. Thomas on May 2, 2014, complaining of anxiety.  [R. 473].  Plaintiff explained that the anxiety was a feeling of nervousness and that it had been associated with

agitation. *Id.* Dr. Thomas noted that the anxiety had not caused physical symptoms and that it had been well-controlled by Celexa previously. *Id.* He changed Plaintiff's medication from Celexa to Cymbalta. *Id.*

On May 7, 2014, Plaintiff visited Allied Physical Therapy upon Dr. Thomas' referral. [R. 485]. Plaintiff stated that she had neck and mid back pain and wanted to decrease her pain and become less reliant on pain medication. *Id.* Dr. Matthew Harkness created a plan to improve Plaintiff's functional limitations, overhead activity tolerance, ability to perform repetitive upper extremity activity, head and neck posture, upper extremity posture, flexibility, and back extension, flexion, and rotation. [R. 486-87]. He diagnosed Plaintiff with cervicalgia, postural dysfunction, and degenerative joint disease of the cervical spine/thoracic spine. [R. 487]. Dr. Harkness determined that Plaintiff should come in for physical therapy three times weekly for four weeks. *Id.* Plaintiff attended physical therapy at Allied Physical Therapy 13 times from May 12, 2014, to September 2, 2014. [R. 524-59]. At the last visit, she reported feeling weak and having difficulty with her walking. [R. 558]. She also stated that her neck at the base of the neck had been painful. *Id.* They physical therapist noted that Plaintiff has subscapular tenderness and difficulty with end range positions of the neck and upper extremities. *Id.*

Plaintiff saw Dr. Thomas on May 24, 2014, and August 29, 2014. [R. 510, 512]. Each time he noted that her anxiety and fibromyalgia were controlled by medication. [R. 511, 513].

## C.   ALJ Decision

The ALJ issued her decision on Plaintiff's claim for benefits on January 30, 2015. [R. 19-30]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 19-21]. She found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in

substantial gainful activity since September 28, 2011, the alleged onset date.  [R. 21].  The ALJ

then found that Plaintiff suffers from the following severe impairment: lumbar myelopathy and

stenosis, fibromyalgia, and mild cervical degenerative disc disease with spondylosis.  *Id.*

The ALJ specifically determined that Plaintiff's "medically determinable mental

impairments of depression and anxiety, considered singly and in combination, do not cause more

than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are

therefore non-severe."  *Id.*  She explained that she had considered the "paragraph B" criteria for

evaluating mental disorders and found that Plaintiff has no limitation in activities of daily living, or

social functioning, has mild limitation in concentration, persistence or pace, and has experienced

no episodes of decompensation of an extended duration.  [R. 21-22].  The ALJ noted that

medical records from Dr. Jerry Thomas showed that Plaintiff's depression and anxiety were

controlled on medication and also that Plaintiff has not engaged in formal psychiatric treatment or

been placed in a psychiatric hospital.  [R. 22].  The ALJ explained that "the following residual

functional capacity assessment reflects the degree of limitation the undersigned has found in the

'paragraph B' mental function analysis."  *Id.*

Next, the ALJ determined that Plaintiff's history of carpal tunnel syndrome was non-severe

as the impairment was corrected by surgery and Plaintiff had "intact examinations with strength as

5/5 bilaterally."  [R. 22].  She also found that Plaintiff's right hand tremor "is not medically

determinable because [Plaintiff] has not established by objective medical evidence that it is a

medically determinable impairment."  *Id.*  The ALJ explained that Plaintiff's "subjective

complaints or symptom or combination of symptoms by itself cannot constitute a medically

determinable impairment."  [R. 23].  She noted that no right hand tremor was mentioned in the

neurological examinations and that Plaintiff's primary care physician, Dr. Thomas, did not

document a right hand tremor.  *Id.*   Finally, the ALJ stated that Plaintiff "displayed a right hand

tremor at the hearing but while the vocational expert was testifying, she had no tremor."  *Id.*

The ALJ found that Plaintiff does not have an impairment or combination of impairments

that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1.  [R. 23].     The ALJ found that Plaintiff

> is capable of performing a wide range of light work with the ability to occasionally
> lift and/or carry up to 20 pounds as defined in the Dictionary of Occupational Title
> (DOT) and regulations as well as, lift carry [sic] 10 pounds frequently.  This
> includes sedentary work as defined in DOT and the regulations.  The claimant has
> no limits for sitting in an eight-hour workday.  She is capable of standing and/or
> walking for up to six hours in an eight-hour workday.  She is able to perform
> occasional postural functions of climbing ramps, stairs, kneeling, and stooping.
> She is to perform no crawling and no climbing of ladders ropes scaffolds [sic].  In
> the course of work, she is to perform no constant fine bilateral manipulations.  The
> claimant is to perform no overhead lifting, no overhead carrying and no overhead
> reaching with the bilateral upper extremities.  Secondary to non-severe mental
> impairments, the claimant retains the capacity to understand, remember and
> carryout [sic] at least SVP 5 instructions and perform SVP 5 tasks as consistent
> with lowest end of skilled work.

*Id.*

The ALJ attested that she had considered all of Plaintiff's symptoms and "the extent to

which these symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence," as well as all of the opinion evidence.   [R. 24].   She then followed

the two-step process—first, determining whether there is an underlying determinable physical or

mental impairment that could reasonably be expected to produce Plaintiff's pain or other

symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's

symptoms to determine the extent to which they limit her functions.  *Id.*   The ALJ summarized

Plaintiff's testimony and found that "the claimant's medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.*   She noted that Plaintiff "sat through an hour hearing without apparent distress." *Id.*   The ALJ also noted that Plaintiff used an assistive device for ambulation at the hearing, but that, at several examinations in the record, Plaintiff was not noted to use a cane and was noted to ambulate normally. *Id.*   The ALJ further explained that she "carefully observed" Plaintiff, and Plaintiff "was not in any obvious pain or discomfort during the course of the hearing" and "lacked the general physical appearance of a person who might have been experiencing prolonged or severe pain." [R. 25].

The ALJ found that medical signs and laboratory findings did not substantiate any physical impairment capable of producing the alleged pain and other symptoms. [R. 25].   She determined that the "record supports that [Plaintiff] has non-severe mental impairments, but these are not supportive of being a causal factor regarding pain." *Id.*   The ALJ concluded that Plaintiff's "subjective pain complaints are not fully credible and the record supports this inconsistency of subjective complaint versus objective findings on examination." *Id.*   She further concluded, "[a]lthough [Plaintiff's] subjective complaints may have some merit, the totality of the supporting medical evidence does not provide clinical correlation of her symptomology to the degree of debility alleged with objective findings on examination." *Id.*   The ALJ then summarized all of the medical record evidence. [R. 25-27].   She gave the State agency medical consultant's physical assessment significant weight, but only gave the consultant's specific finding that Plaintiff could stand and/or walk for four hours in an eight-hour workday moderate weight. [R. 27].

The ALJ next found that Plaintiff is capable of performing her past relevant work as a home health coordinator and that such work accommodates the sit/stand option and does not

18

require performance of work-related activities precluded by Plaintiff's residual functional capacity. [R. 27-28]. The ALJ also found that, although Plaintiff is capable of performing past relevant work, there are other jobs existing in the national economy that Plaintiff is also able to perform. [R. 28]. She then made alternative findings for step five of the sequential evaluation process. *Id.*

The ALJ noted that Plaintiff was a younger individual (18-49 years old) on the alleged onset disability date, that she has at least a high school education, that she is able to communicate in English, and that she acquired work skills from past relevant work. [R. 28]. The ALJ explained that the vocational expert testified that Plaintiff had transferrable health care skills of patient care and use of independent judgment which could be transferred to the job of companion. *Id.* The ALJ further explained that Plaintiff also had transferrable clerical, scheduling, computer work, and customer service skills, which could be transferred to the jobs of receptionist, dispatcher, and/or hospital admit clerk. *Id.*

The ALJ noted that, when she posed her initial hypothetical, the vocational expert testified that Plaintiff could work as an office helper, order clerk, or surveillance system. [R. 29]. The ALJ also explained that, even when she changed her hypothetical to add additional restrictions, including that Plaintiff could only stand or walk for two or four hours in an eight-hour workday, there "were still a significant number of jobs in existence, as the sedentary jobs cited would remain." *Id.* She noted that "all of the light and sedentary jobs cited accommodate the option to alternate between sitting and standing," although the ALJ did not explicitly add these limitations to the RFC. *Id.* Finally, the ALJ explained, "the above-cited jobs…allow for any restrictive limitations that are alleged by [Plaintiff]. The vocational expert further testified that the use of a cane when walking to from [sic] a workstation allows for the home health coordinator and all

19

sedentary jobs remain." *Id.*

The ALJ determined that "although [Plaintiff's] additional limitations do not allow [Plaintiff] to perform a full range of light work, considering [Plaintiff's] age, education and transferable work skills, a finding of 'not disabled' is appropriate under the framework of Medical-Vocational Rule 202.22 and Rule 202.15." [R. 29-30]. The ALJ concluded that Plaintiff has not been under a disability since September 28, 2011. [R. 30].

## II. <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In her Motion for Summary Judgment, Plaintiff makes three main arguments. [DE 35]. First, she argues that the ALJ's credibility assessment regarding Plaintiff is not supported by substantial evidence because the ALJ improperly engaged in "sit and squirm" jurisprudence. *Id.* Second, Plaintiff asserts that the ALJ committed harmful error by finding that Plaintiff's mental impairments were non-severe and trivial. *Id.* Third, Plaintiff contends that the ALJ's RFC is not supported by substantial evidence because the ALJ did not account for Plaintiff's mental impairments. *Id.*

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, she contends substantial evidence supports the ALJ's evaluation of Plaintiff's credibility. [DE 36]. Next, Defendant argues that substantial evidence supports the ALJ's finding that Plaintiff's alleged mental impairments were not severe. *Id.* Finally, Defendant argues that substantial evidence supports the ALJ's RFC finding. *Id.*

## III. <u>LEGAL ANALYSIS</u>

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal

standards.   Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)).   Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact.   No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability.   20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f).   The ALJ must first determine whether the claimant is presently employed.   If so, a finding of non-disability is made, and the inquiry concludes.   20 C.F.R. § 404.1520(b).   In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends.   20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the

listing of impairments.   20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work.   *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985).   If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded.   20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work.   If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established.   20 C.F.R. § 404.1520(e).   The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience.   20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239.   In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert.   *See Phillips*, 357 F. 3d at 1239-40.

A.   Whether the ALJ improperly utilized "sit and squirm jurisprudence"

Plaintiff asserts that the ALJ erred in using "sit and squirm jurisprudence," meaning that the ALJ improperly made medical conclusions based on her observations at the hearing. Defendant contends that substantial evidence supports the ALJ's evaluation of Plaintiff's credibility.

The ALJ wrote in the decision the following:

The undersigned notes that the claimant sat through an hour hearing without apparent distress.   She presented as articulate, coherent, intelligent and demonstrated good memory.   She utilized an assistive device for ambulation and

22

> she responded appropriately to all questions with maintenance of good eye contact. It bears noting that at several examinations in the record, the claimant is NOT noted to use a cane and she is noted to ambulate normally....The undersigned Administrative Law Judge carefully observed claimant and notes that he [sic] was not in any obvious pain or discomfort during the course of the hearing.  In addition, the claimant lacked the general physical appearance of a person who might have been experiencing prolonged or severe pain.

[R. 24-25].

Plaintiff is correct that an ALJ is not permitted to utilize "sit and squirm" jurisprudence. *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982).  The court in *Freeman* defined "sit and squirm" jurisprudence as follows:   "In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant falls short of this index, the claim is denied."  *Id.* at p. 731.

Here, the ALJ did state that Plaintiff was able to participate in the hearing without signs of obvious pain or discomfort.  However, the Court first notes that "the ALJ may consider a claimant's demeanor among other criteria in making credibility determinations."  *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985).  The simple fact that the ALJ considered Plaintiff's demeanor during the hearing does not mean that the ALJ necessarily committed any error.  It is a traditional and well-accepted role of a judge to observe the demeanor of a witness when making credibility determinations.

Moreover, in this case, the ALJ explained in detail in her decision how Plaintiff's subjective complaints were at odds with the objective findings on examination.  *See* R. 25-27. The ALJ did not assign great weight to her observations of Plaintiff, and her observations of Plaintiff were in agreement with all of the other evidence in this case.   Thus, reversal of the ALJ's decision would be improper.  *See Escobedo v. Astrue*, No. 08-61640-CIV, 2009 WL 2905732, at * 15 (S.D. Fla. Sept. 10, 2009) ("Based on the minimal weight assigned to the plaintiff's observed

behavior at the hearing, the undersigned finds that the ALJ did not base his determination on the type of 'sit and squirm' jurisprudence condemned by *Freeman, supra*.").

The Eleventh Circuit has established a three part "pain standard" to be utilized by the ALJ when a claimant tries to "establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The standard requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.* The ALJ properly employed that test and based her credibility determination on many different factors which are laid out in her decision, including the medical evidence, Plaintiff's actual allegations of pain at the hearing, and Plaintiff's work history. *See* § 404.1529.

Finally, the ALJ's conclusion that the objective medical evidence did not support Plaintiff's alleged pain is based on the substantial record evidence. On October 27, 2011, Dr. Andrew Gross noted that Plaintiff had a normal gait and ambulated without a limp. [R. 286]. Dr. Gross also noted that imaging of Plaintiff's cervical and lumbar spines showed mild degenerative disc disease and osteoarthritis of the cervical spine and minimal degenerative disc disease of the lumbar spine. *Id.* Dr. Gross diagnosed Plaintiff with carpal tunnel syndrome, causalgia, sacroiliitis, lumbosacral spondylosis without myelopathy, neck pain, and low back pain. [R. 287]. He recommended injections, medication, and physical therapy. *Id.* An October 31, 2011 MRI of Plaintiff's lumbar spine showed foraminal and lateral annular bulge on the right side at L4-5 with partial effacement of the perineural fat around the exiting right L4 nerve root. [R. 337].

On November 15, 2011, Dr. Gross noted that medications only partially relieved Plaintiff's pain. [R. 280]. He explained that Plaintiff was not to return to full duty work on an indefinite basis. [R. 282]. On December 19, 2011, Dr. Gross noted that epidural injections had either given no relief or made Plaintiff's pain worse, and he gave her an additional injection. [R. 276-78]. Based upon Dr. Gross' referral, on January 5, 2012, Plaintiff saw Dr. John Sarzier for a neurosurgical consultation. [R. 310]. Dr. Sarzier diagnosed Plaintiff with lumbar spinal stenosis and noted that Plaintiff had exhausted conservative therapy. [R. 313]. He offered Plaintiff surgical intervention, and she stated that she wished to proceed to surgery. *Id.* On January 11, 2012, Plaintiff had a right-sided L4-5 foraminotomy (far lateral hemilaminotomy, medial facetectomy, and far lateral discectomy). [R. 264].

On January 31, 2012, Plaintiff had an MRI of her lumbar spine. [R. 334]. It was determined that she had operative changes at the right facet joint at L4-5 with enhancement of the right foramen and around the L5 nerve root with interval development of enhancement of this right S1 nerve root. *Id.* She was not found to have recurrent disc herniation. *Id.* On February 9, 2012, Dr. Sarzier noted that Plaintiff ambulated without the use of an assistive device. [R. 373]. On February 28, 2012, Dr. Sarzier recommended physical therapy. [R. 358].

In the March 23, 2012, Disability Determination Explanation at the initial level, the medical consultant found that Plaintiff could perform skilled, sedentary work and was not disabled. [R. 94-95]. In the June 25, 2012, Disability Determination Explanation at the reconsideration level, the medical consultant found that Plaintiff could stand and/or walk for a total of four hours in an eight-hour workday, could perform skilled, sedentary work, and was not disabled. [R. 104-107].

On April 3, 2012, Dr. Sarzier noted that Plaintiff's postoperative imaging of her spine and

hip did not show significant pathology that would explain Plaintiff's complaints.  *Id.*   Dr. Sarzier referred Plaintiff to a psychiatrist.  [R. 371].   He also discontinued Plaintiff's Valium and gave her the last prescription of Percocet he was willing to prescribe.  *Id.*

On May 1, 2012, Plaintiff saw Dr. Robert Mehrberg for a psychiatric consultation.  [R. 368].  He opined that Plaintiff suffers from a chronic pain syndrome, likely fibromyalgia.  [R. 370].  On June 7, 2012, Plaintiff saw Dr. Jack Clark for a rheumatology consult.  [R. 379].  He diagnosed her with fibromyalgia and prescribed medication.  [R. 380].  Plaintiff saw Dr. Clark again on August 21, 2012.  [R. 383].  Plaintiff continued to complain of pain, and the doctor changed her medications.  [R. 384].

Plaintiff saw Dr. Thomas on September 5, 2012, for a follow up regarding her fibromyalgia, anxiety, and high lipids.  [R. 461].  Dr. Thomas altered Plaintiff's medications. [R. 462].  Plaintiff visited Dr. Thomas again on September 19, 2012, because her medications had not controlled her pain.  [R. 458].  Dr. Thomas prescribed medication for Plaintiff's hyperlipidemia and fibromyalgia.  [R. 459].

On October 17, 2012, Plaintiff had a consult with Dr. Adam Shuster regarding her chronic pain, which had worsened over the last six months.  [R. 388].  Dr. Shuster prescribed Plaintiff additional medication.  [R. 391].  He also recommended that Plaintiff see a psychologist for possible cognitive behavioral therapy to help with her fibromyalgia.  [R. 401].  Plaintiff saw Dr. Shuster again on November 20, 2012.  [R. 401].  Dr. Shuster noted that Plaintiff was using a cane to walk.  *Id.*  He increased Plaintiff's hydrocodone until she could come in for injection therapy. *Id.*

On January 3, 2013, Dr. Shuster adjusted Plaintiff's medications and performed a transforaminal epidural steroid injection at the L5-S1 level on the right side.  [R. 413].  On

January 31, 2013, Dr. Shuster performed a caudal epidural steroid injection under fluoroscopic guidance. [R. 425]. On March 6, 2013, Plaintiff told Dr. Shuster that she did not want any further injection therapy. [R. 435]. Dr. Shuster told Plaintiff to continue on her hydrocodone, Zanaflex, and gabapentin. [R. 436]. On May 2, 2013, Plaintiff told Dr. Shuster she was unwilling to try a spinal cord stimulator. [R. 445]. Dr. Shuster prescribed Plaintiff hydrocodone and suggested she find another doctor. *Id.*

On May 8, 2013, Dr. Thomas on May 8, 2013, noted Plaintiff's normal gait and normal muscle strength, as well as her decreased range of motion and paraspinous muscle spasms. [R. 456]. Dr. Thomas completed a trigger point injection and changed Plaintiff's pain medications. [R. 457]. On June 13, 2013, Dr. Thomas continued Plaintiff on the same medications for her pain. [R. 455]. Plaintiff saw Dr. Thomas on November 19, 2013, for a pain medication prescription. [R. 478]. On February 21, 2014, Dr. Thomas continued Plaintiff's pain medication. [R. 476].

On March 27, 2014, Plaintiff had imaging of her hips and pelvis completed. [R. 491]. It was determined that she had no fractures or dislocations of the hips bilaterally, as well as no pelvic fractures, osteolytic or osteoblastic bony lesions. *Id.* On the same date, she had imaging of her lumbar spine and cervical spines completed. [R. 489-90]. It was determined that Plaintiff had no fracture or spondylosisthesis of the lumbar spine or the cervical spine, but had degenerative spondylosis of the cervical spine most significant at the C5-6 level. *Id.*

On May 7, 2014, Plaintiff visited Allied Physical Therapy upon Dr. Thomas' referral. [R. 485]. Dr. Matthew Harkness created a plan to improve Plaintiff's functional limitations, overhead activity tolerance, ability to perform repetitive upper extremity activity, head and neck posture, upper extremity posture, flexibility, and back extension, flexion, and rotation. [R. 486-87]. Plaintiff attended physical therapy at Allied Physical Therapy 13 times from May 12, 2014, to

September 2, 2014. [R. 524-59]. At the last visit, the physical therapist noted that Plaintiff has subscapular tenderness and difficulty with end range positions of the neck and upper extremities. [R. 458]. Plaintiff saw Dr. Thomas on May 24, 2014, and August 29, 2014. [R. 510, 512]. Each time he noted that her fibromyalgia was controlled by medication. [R. 511, 513].

The ALJ's decision is supported by substantial evidence, which is summarized above. The ALJ's decision is not simply based on her observations of Plaintiff at the hearing. A review of the record shows that the ALJ did not base her decision on the type of "sit and squirm" jurisprudence condemned by *Freeman, supra.* The ALJ did not substitute her judgment for that of the medical and vocational experts, as occurred in *Freeman, supra,* 681 F.2d at 73. Rather, the ALJ's observations were in accord with the medical and vocational evidence. Further, the ALJ's observation of Plaintiff at the hearing was only one small basis supporting the ALJ's decision. There was other substantial evidence supporting the ALJ's decision. The ALJ, therefore, did not commit reversible error.

B. Whether the ALJ erred in finding that Plaintiff's mental impairments were non-severe and trivial

Plaintiff argues that the ALJ should have listed Plaintiff's mental impairments as severe impairments. [DE 35, pp. 12-18]. Plaintiff asserts that "the medical evidence of record indicates that Plaintiff has changed medications multiple times, which strongly suggests that her symptoms of depression and anxiety were not well-controlled at all times." *Id.* at p. 13. Plaintiff further contends that the ALJ "erred by not considering the ongoing need to alter Plaintiff's medications due to exacerbation of symptoms. Additionally, records from May 2014 indicate that Plaintiff's anxiety was worsening and not well-controlled." *Id.* at pp. 13-14. Plaintiff contends that the ALJ failed to properly consider Plaintiff's mental impairments and erred in finding that they have

no effect on Plaintiff's ability to work.  *Id.* at p. 14.

Defendant contends that the ALJ did note Plaintiff's mental impairments but did not find them to be severe.  [DE 36, p. 13].   Defendant maintains that the ALJ found in Plaintiff's favor at step 2 and proceeded with the other steps of the sequential evaluation process, so Plaintiff cannot show error.  *Id.*   Defendant also asserts that Plaintiff failed to prove that she had a severe mental impairment.  *Id.* at pp. 13-14.   Defendant argues that "Plaintiff has not cited any medical evidence establishing that she had work related limitations" and that "[d]iagnoses do not establish work-related limitations."  *Id.* at p. 14.   Next, Defendant argues that the record evidence "does not support Plaintiff's testimony that her mental impairments were negatively affecting her ability to concentrate, sustain attention, and follow directions."  *Id.*   Finally, Defendant contends that "Plaintiff failed to prove that her depression and anxiety, whether severe or not severe, caused additional limitations on her ability to work."  *Id.* at p. 15.

An ALJ is required at step two of 20 C.F.R. § 404.1520 to determine whether the claimant's impairment is severe or not severe.  "Step two is a threshold inquiry.   It allows only claims based on the most trivial impairments to be rejected.   The claimant's burden at step two is mild.   An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work . . . ." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).   The Eleventh Circuit Court of Appeals has further explained that, "if no severe impairment is shown [at step two] the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two."  *Jamison v. Brown*, 814 F.2d 585, 588 (11th Cir. 1987).   As the ALJ continues to steps three, four, and five of the

required analysis, the ALJ "is to consider the claimant's entire medical condition, including any impairment or combination of impairments, whether severe or not." *Childers v. Social Sec. Admin., Comm'r*, 521 Fed. Appx. 809, 811 (11th Cir. 1013) (citing *Jamison*, 814 F.2d at 588).

At step two of the required analysis, the ALJ found that Plaintiff suffers from the following severe impairments: lumbar myelopathy and stenosis, fibromyalgia, and mild cervical degenerative disc disease with spondylosis. [R. 21]. The ALJ specifically determined that Plaintiff's "medically determinable mental impairments of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore non-severe." *Id.* She explained that she had considered the "paragraph B" criteria for evaluating mental disorders and found that Plaintiff has no limitation in activities of daily living, or social functioning, has mild limitation in concentration, persistence or pace, and has experienced no episodes of decompensation which would have been of an extended duration. [R. 21-22]. The ALJ noted that medical records from Dr. Jerry Thomas showed that Plaintiff's depression and anxiety were controlled on medication and also that Plaintiff has not engaged in formal psychiatric treatment or been placed in a psychiatric hospital. [R. 22]. The ALJ explained that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." *Id.*

The Court finds that the record evidence supports the ALJ's finding the Plaintiff's mental impairments were not severe. On September 16, 2011, Dr. Jerry Thomas increased Plaintiff's depression medication. [R. 254]. On October 10, 2011, Dr. Thomas noted that Plaintiff's depression was controlled on medication. [R. 252]. Plaintiff saw Dr. Thomas on March 29, 2012, for her depression. [R. 463]. Plaintiff did not have anxiety or suicidal ideation. *Id.* Dr.

Thomas prescribed medication. *Id.*

On May 1, 2012, Plaintiff saw Dr. Robert Mehrberg for a psychiatric consultation. [R. 368]. Dr. Mehrberg noted that Plaintiff was on Celexa for her depression. *Id.* He opined that Plaintiff suffers from a chronic pain syndrome, likely fibromyalgia. [R. 370].

On October 17, 2012, Dr. Shuster found that Plaintiff scored a 36 on the Beck depression inventory, which is significant for depression, though Plaintiff had not suicidal ideation. [R. 390]. Dr. Shuster prescribed Plaintiff additional medication and told her to continue taking Cymbalta. [R. 391]. He also recommended that Plaintiff see a psychologist for possible cognitive behavioral therapy to help with her fibromyalgia. [R. 401].

On June 13, 2013, Dr. Thomas continued Plaintiff on the same medications for her anxiety. [R. 455]. On August 18, 2013, Dr. Thomas changed some medications and continued others, and he noted that Plaintiff's anxiety and depression were controlled by medication. [R. 480]. Plaintiff saw Dr. Thomas on February 21, 2014, and he noted that her depression and anxiety were controlled by medication. [R. 475-76]. Plaintiff saw Dr. Thomas on May 2, 2014, complaining of anxiety. [R. 473]. Dr. Thomas noted that the anxiety had not caused physical symptoms and that it had been well-controlled by Celexa previously. *Id.* He changed Plaintiff's medication from Celexa to Cymbalta. *Id.* On May 24, 2014, Dr. Thomas noted that Plaintiff's anxiety and fibromyalgia were controlled by medication. [R. 513]. On August 29, 2014, Dr. Thomas again noted that Plaintiff's anxiety and fibromyalgia were controlled by medication. [R. 511].

The evidence supports the ALJ's finding the Plaintiff's mental impairments were not severe. Moreover, even if the ALJ's finding was in error, it would be a harmless error since the ALJ completed the sequential inquiry any way and also considered Plaintiff's mental impairments' effect on her ability to work. *See Delia v. Comm'r of Social Sec.*, 433 Fed. Appx.

885 (11th Cir. 2011).   Reversal on such a basis (assuming it was error as claimed by Plaintiff) would improperly place form over substance.   In this case, as noted previously, the evidence does support the ALJ's finding that Plaintiff's mental impairments were not severe.

> C.  <u>Whether the ALJ erroneously failed to properly assess the impact of Plaintiff's mental impairments on her Residual Functional Capacity when the ALJ did not include any significant restrictions in Plaintiff's ability to perform basic mental work activities</u>

Plaintiff contends that the ALJ erred because she did find that Plaintiff's anxiety and depression caused some limitations to Plaintiff's ability to perform basic work activities, but "the only limitation articulated in the RFC assessment was that Plaintiff 'retains the capacity to understand, remember, and carry-out at least SVP 5 instructions and perform SVP 5 tasks as consistent with the lowest end of skilled work." [DE 35, p. 15].   Plaintiff argues that this limitation is insufficient as it is "effectively no limitation at all" and is inconsistent with the presence of limitations in concentration, persistence, and pace.   *Id.* at p. 15.   Plaintiff also asserts that the RFC is "not properly formulated" because the RFC is supposed to indicate the Plaintiff's maximum capabilities and not the minimum she can do.   *Id.* at p. 16.   Plaintiff contends that the ALJ erred in that she failed to "assess functional limitations in the ability to maintain concentration, persistence, and pace", and instead speculated as to what level of SVP Plaintiff can perform.   *Id.*   Finally, Plaintiff argues that "[b]ecause the ALJ did not properly account for all medical impairments in the hypothetical question posed to the VE, his testimony cannot be accepted and renders the ALJ's Decision unsupported by substantial evidence.   *Id.* at p. 17.

Defendant argues that "the medical evidence does not establish that Plaintiff was more limited than the ALJ found."   [DE 36, p. 15].   Defendant contends that there is no evidence showing that Plaintiff "had work related mental limitations that would prevent her from performing the jobs identified by the ALJ."   *Id.* at p. 16.

The ALJ specifically determined that Plaintiff's "medically determinable mental impairments of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore non-severe."  *Id.*  She explained that she had considered the "paragraph B" criteria for evaluating mental disorders and found that Plaintiff has no limitation in activities of daily living, or social functioning, has mild limitation in concentration, persistence or pace, and has experienced no episodes of decompensation which would have been of an extended duration.  [R. 21-22]. The ALJ noted that medical records from Dr. Jerry Thomas showed that Plaintiff's depression and anxiety were controlled on medication and also that Plaintiff has not engaged in formal psychiatric treatment or been placed in a psychiatric hospital.  [R. 22].  The ALJ explained that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  *Id.*

The ALJ found that Plaintiff

> is capable of performing a wide range of light work with the ability to occasionally lift and/or carry up to 20 pounds as defined in the Dictionary of Occupational Title (DOT) and regulations as well as, lift carry [sic] 10 pounds frequently.  This includes sedentary work as defined in DOT and the regulations.  The claimant has no limits for sitting in an eight-hour workday.  She is capable of standing and/or walking for up to six hours in an eight-hour workday.  She is able to perform occasional postural functions of climbing ramps, stairs, kneeling, and stooping. She is to perform no crawling and no climbing of ladders ropes scaffolds [sic].  In the course of work, she is to perform no constant fine bilateral manipulations.  The claimant is to perform no overhead lifting, no overhead carrying and no overhead reaching with the bilateral upper extremities.  Secondary to non-severe mental impairments, the claimant retains the capacity to understand, remember and carryout [sic] at least SVP 5 instructions and perform SVP 5 tasks as consistent with lowest end of skilled work.

[R. 23].

"To evaluate the severity of a claimant's mental impairments in steps two and three, the

regulations direct the ALJ to use a special Psychiatric Review Technique (PRT)." *Hines-Sharp v. Comm'r of Soc. Sec.*, 511 F. App'x 913, 915 (11th Cir. 2013) (citing *Moore v. Barnhart,* 405 F.3d 1208, 1214 (11th Cir.2005); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180-81 (11th Cir. 2011). Using the PRT, the ALJ is required to decide if a claimant's mental impairments cause limitations in one of "four broad functional areas," including the claimant's ability to maintain "concentration, persistence, or pace...." 20 C.F.R. § 404.1520a(c)(3). "If the ALJ finds such a limitation, then the ALJ must include it as part of a description of the claimant's RFC in any hypothetical question posed to the VE." *Hines-Sharp*, 511 F. App'x at 915 (citing *Winschel,* 631 F.3d at 1180–81).

"The hypothetical need only include the claimant's impairments, not each and every symptom of the claimant." *Monaco v. Comm'r of Soc. Sec.*, No. 2:15-CV-685-FTM-CM, 2017 WL 632511, at *9 (M.D. Fla. Feb. 16, 2017) (quoting *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1270 (11th Cir. 2007) (citation and quotation marks omitted). "Although an ALJ's hypothetical question must take into account all of a claimant's impairments...the question need not include impairments that the ALJ has properly determined to be unsupported by the evidence in the record, as the ALJ did here." *Id.* (citing *Crawford*, 363 F.3d at 1161).

Here, the Court notes that it has already found that the ALJ did not err in finding that Plaintiff's mental impairments were non-severe. While the ALJ did state in her decision that Plaintiff had a mild limitation in concentration, persistence or pace, the ALJ was not required to include such a finding in her RFC or in her hypotheticals to the vocational expert. [R. 22]. This case is distinguishable from *Winschel*, "because the ALJ concluded based on the evidence that Plaintiff's ability to perform her past relevant work was unaffected by her mild mental limitations. Substantial evidence supports the ALJ's determination of this issue." *Dowling v. Colvin*, No.

34

1:12-CV-57-GRJ, 2013 WL 1197678, at *7 (N.D. Fla. Mar. 22, 2013).   Similarly, in the case

cited by Defendant, *Wolfe v. Colvin*, No. 8:12-CV-903-T-TGW, 2013 WL 3285358, at *6 (M.D.

Fla. June 27, 2013), the court found that "[i]n light of these mild limitations, which indicate that

the conditions do not significantly affect the plaintiff's ability to work, *see* 20 C.F.R.

404.1520a(d)(1), there were no limitations to be included in a hypothetical question to the

vocational expert relating to concentration or social functioning.   Consequently, the hypothetical

question was not deficient." *Id.*

Finally, "Social Security Ruling 96–8p defines an individual's residual functional capacity

as the person's maximum remaining ability 'to do sustained work activities in an ordinary work

setting on a regular and continuing basis.'" S.S.R. 96–8p at 2.   *Rye v. Comm'r of Soc. Sec. Admin.*,

270 F. App'x 938, 939 (11th Cir. 2008).   The last sentence of the ALJ's RFC states that,

"[s]econdary to non-severe mental impairments, the claimant retains the capacity to understand,

remember and carryout [sic] at least SVP 5 instructions and perform SVP 5 tasks as consistent with

lowest end of skilled work."   [R. 23].

While the ALJ's RFC for Plaintiff is awkwardly crafted, it is clear that the ALJ intended to

state that the Plaintiff could carry out and perform a maximum of SVP 5 tasks.   The ALJ's first

hypothetical to the vocational expert included, in relevant part, that the individual  have the

"capacity to remember, understand, and carry out at least SVP 5 instructions and perform at least

SVP 5 jobs as consistent with the lowest end of skilled work."   [R. 68-69].   Then, for the third

hypothetical, the ALJ combined the first and second hypotheticals and then dropped the SPV level

to 3 to 4 from 5.   [R. 71].   She then asked if there are any transferable skills from the past work

that would transfer to other light SVP 3 to 4 jobs.   *Id.*

Regardless, even if the ALJ improperly crafted the last sentence of the RFC as a minimum

rather than a maximum, this would be harmless error.  "SVP" stands for "Specific Vocational Preparation", which is the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  20 C.F.R. § 656.3.  "SVP 5" is the lowest level of "skilled work" in the DOT.  *See* https://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html  (last visited on May 23, 2017).  The RFC properly set limitations for Plaintiff and stated that she was capable of performing the lowest end of skilled work.  The RFC is not erroneous despite the inartful language in the last sentence.

## IV. CONCLUSION

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**.  Accordingly, Plaintiff's Motion for Summary Judgment [DE 35] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 36] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 14th day of July, 2017.

WILLIAM MATTHEWMAN
United States Magistrate Judge